## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

**RACHAEL RENEE DODSON,**

     **Plaintiff,**

**vs.**                                                                                    **CIVIL ACTION NO. 1:16-06732**

**CAROLYN W. COLVIN**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

### <u>MEMORANDUM OPINION</u>

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Presently pending before the Court are parties' cross-motions for Judgment on the Pleadings[1]. (Document Nos. 17 and 20.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 4 and 5.)

The Plaintiff, hereinafter "Claimant", Rachael Renee Dodson, filed an application[2] for SSI benefits on November 6, 2012 (protective filing date), alleging disability since her birth, November 25, 1991, due to "Fragile X syndrome, chronic anxiety disorder, depression, ADD, developmentally delayed/age inappropriate behavior, difficulty with small motor skill/uncoordinated, difficulty with critical thinking skills, unable to handle money and finances,

---

[1] The undersigned granted the parties' respective motions to file briefs in support of their arguments in excess of twenty pages. (Document Nos. 16 and 19.)
[2] It is noted that Claimant's mother, Tina Renee Dodson, was primarily responsible in the filing of this claim. (Tr. at 214.)

unable to hold age appropriate conversation with peers, and cannot drive".[3] (Tr. at 215.) Claimant's application was denied initially and upon reconsideration. (Tr. at 115-119, 129-135.) On October 18, 2013, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 136-138.) The hearing was held on December 3, 2014, before the Honorable Geraldine H. Page. (Tr. at 32-66.) By decision dated January 28, 2015, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 10-31.) The ALJ's decision became the final decision of the Commissioner on June 14, 2016 when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On July 27, 2016, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the

---

[3] On her form Disability Report – Appeal, submitted on July 12, 2013, Claimant asserted that since her last disability report dated November 15, 2012, "[s]he stays in bed 24-7, doesn't get up to do anything. Her depression and anxiety worse" and "[d]oesn't feel like doing anything. Has gained 20 pounds because she just lays around and stays in bed." (Tr. at 235.) On a subsequent form Disability Report – Appeal, submitted on October 18, 2013, Claimant asserted that since her last disability report "I stay in bed all the time; I have gained 40 pounds" and that she developed new physical and mental limitations: "[w]eight gain; I can't climb steps because I get out of breath; I have no survival skills". (Tr. at 243.)

second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 416.920(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 416.920a(c). Those sections provide as follows:

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and

how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 416.920a(d)(1).[4] Fourth, if the claimant's impairment(s) is/are deemed

---

[4] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. 20 C.F.R. § 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 416.920a(e)(4).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the application date, November 6, 2012. (Tr. at 15, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: fragile X syndrome; anxiety disorder; depressive disorder; attention deficit/hyperactivity disorder; and borderline intellectual functioning. (Id., Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id., Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform a full range of work at all exertional levels, with the following non-exertional limitations:

the claimant is able to understand, remember, and carry out simple instructions in repetitive unskilled work. She can perform work that involves no interaction with the general public. The claimant can have no more than occasional interactions with coworkers and supervisors, but is able to respond appropriately to supervision, coworkers, and usual work situations. She cannot work in a fast-paced environment such as an assembly line.

(Tr. at 17, Finding No. 4.) At step four, the ALJ found that Claimant had no past relevant work. (Tr. at 26, Finding No. 6.) At step five of the analysis, the ALJ found Claimant was 20 years old as of the application filing date, which is defined as a younger individual under 20 C.F.R. § 416.963(c). (Tr. at 27, Finding No. 6.) The ALJ found that Claimant had at least a high school education, and could communicate in English. (Id., Finding No. 7.) The ALJ determined that transferability of job skills was immaterial to the determination of disability, because Claimant did not have past relevant work, and that due to Claimant's age, education, work experience, and residual functional capacity that there were other jobs existing in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 8, 9.) On this basis, benefits were denied. (Tr. at 28, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on November 25, 1991, and was 23 years old at the time of the ALJ's decision. (Tr. at 37.) Claimant had graduated high school in 2010, attended New River Community College, and then attended Concord University before dropping out with enough credits to be a junior.[5] (Tr. at 37, 50.) Claimant has never worked, but indicated interest in earning her degree. (Tr. at 37, 49, 248.)

Issues on Appeal

Claimant contends that this case hinges entirely on her mental impairments and has alleged three main errors in support of her appeal: (1) that the ALJ failed to abide by the Regulations in evaluating the opinion evidence, specifically in discounting the opinion and testimony provided by Claimant's treating psychologist (Document No. 17 at 4-17.); (2) that the ALJ erred in her credibility determination, which pertained to Claimant's mother, but not to Claimant herself (Id. at 17-20.); and (3) that the ALJ's RFC is not based on substantial evidence, as it failed to consider Claimant's limitations as established by the evidence of record. (Id. at 20-23.)

---

[5] The undersigned notes that the parties frequently refer to Claimant's educational record as either being in special education or general education curriculum: Claimant's mother testified that she has "always" been enrolled in special education classes (Tr. at 54.), and the Individualized Education Program (IEP) records submitted into evidence in this matter indicate that Claimant had been in general education classes full time during her senior year, 2009-2010. (Tr. at 266, 268.) The IEP provides that Claimant's plan "will lead to a standard diploma." (Tr. at 262.) Claimant had reported to Mr. Robert D. Rhodes that she had an inclusion teacher (Tr. at 281.); a special education teacher had been a member of Claimant's IEP treatment team. (Tr. at 270, 273, 276-278.)

The Relevant Evidence of Record[6]

The Court has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Robert D. Rhodes, M.A., M.S.:

On May 22, 2009 and June 16, 2009, Mr. Rhodes, a supervised psychologist under licensed psychologist William Brezinski, M.A.,[7] at Laurel Ridge Psychological Associates, performed a neuropsychological evaluation on Claimant on referral from her pediatrician, Dr. Safder. (Tr. at 281-287.) Claimant reported attention difficulties in school, but denied any attention problems while watching television, playing on the computer, or socializing with her best friend. (Tr. at 282.) She also reported past pharmacological treatment for attention deficit disorder (ADD), but did not like the medication side effects. (Id.) She also had a history of counseling, and her mother recently resumed contact with a counselor to re-establish treatment. (Id.) Mr. Rhodes administered twenty-one tests to Claimant and summarized the results:

> Research on females with Fragile X syndrome indicates that the areas which are most likely to be negatively impacted are the executive functions and visuospatial processing abilities. This is the exact pattern displayed be (sic) Rachael. Her most noticeable deficits occur in the area of executive functioning, and are related to her inability to maintain intention (sic) to the task at hand, generate appropriate response strategies, modify response strategies when they have been proven to be ineffective, and inhibit impulsive behaviors.
>
> Rachael exhibited difficulty in maintaining her focus on the task at hand during several of the tests used in this evaluation. She stated during the evaluation that she did not wish to take any medication to help her focus her attention, but she would likely benefit from at least a trial of such medication, particularly during the next academic year. This would likely help to diminish the amount of time that [she] spends daydreaming during class, and would also improve her ability to focus on

---

[6] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.
[7] Claimant "received behavioral counseling from Mr. Brezinski for several years." (Tr. at 282.) Mr. Rhodes noted that Claimant's mother recently resumed contact with Mr. Brezinski to assist with Claimant's problematic behaviors. (Id.)

relevant material during lectures.

(Tr. at 286.)

Mr. Rhodes diagnosed Claimant with cognitive disorder, NOS and ADHD "by history", Fragile X syndrome, academic difficulties, and limited peer interaction; he assigned a Global Assessment of Functioning (GAF) score of 65.[8] (Tr. at 287.)

Treating Physician and Psychologist:

During a November 2011 appointment with her primary care physician, Christopher Parrish, D.O., noted that Claimant was currently taking Adderall XR for her Attention Deficit Disorder (ADD). (Tr. at 324-327.) She reported that she was a broadcasting journalism student. (Tr. at 325.) Claimant reported no personality changes, mood swings, suicidal ideation or attempts, or unusual behavior and good sleep; normal activity, no change in appetite, and no decrease in ability to concentrate. (Id.) Dr. Parrish's examination showed Claimant was oriented to person, place, time, and general circumstances; had an appropriate mood and affect; had an intact recent and remote memory; could provide her personal history; and understood everyday activities, consequences, her own needs, and social situations. (Tr. at 327.) He diagnosed ADD and noted Claimant was "stable" and "improved". (Id.) Dr. Parrish refilled Claimant's ADD medication and prescribed anti-nausea medication. (Id.)

During January and March 2012 follow-up appointments, Claimant again had normal

---

[8] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 61-70 indicates that the person has "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

mental status examinations with positive and normal affect, and stable and improved mental status. (Tr. at 314-315, 318-319, 322-323.) She also reported in March 2012 that she was doing well, and had done well on her mid-term examinations with the exception of math (for which she was getting a tutor). (Tr. at 311.) She reported, "[T]he Adderall is making a big difference in her ability to concentrate and do well in class". (Id.) Dr. Parrish advised her to continue taking her medications. (Tr. at 360.)

In July 2012, Claimant reported fatigue and difficulty staying focused and motivated for daily home tasks. (Tr. at 307.) Dr. Parrish's mental status examination revealed Claimant was oriented times three with an appropriate mood and affect. (Tr. at 308.) Dr. Parrish prescribed Adderall for ADD, and vitamin B12 and folate for fatigue. (Tr. at 309.)

Dr. Parrish referred Claimant to John Terry, M.S., for an initial psychological evaluation on August 15, 2012, when Claimant was twenty years old. (Tr. at 365-367.) Claimant's mother reported that Claimant had fragile X syndrome and ADD. (Tr. at 365.) She indicated that Claimant lived a very sheltered life, although Mr. Terry questioned whether that was due to Claimant's medical condition or to her mother's own psychological issues. (Id.) Claimant was currently attending courses at Concord University, along with her father. (Id.) Her father was graduating later that year, and Claimant would need to manage the campus alone after that. (Id.) Claimant understood that she was somewhat socially awkward, and reported some depression secondary to her best friend getting into a romantic relationship and spending less time with her. (Tr. at 365-366.)

On examination, Claimant had an anxious and dysphoric mood with a somewhat tense affect. (Tr. at 366.) She was alert and well-oriented; was not confused; displayed no evidence of

psychotic processes influencing her thoughts or behavior; had relevant and coherent speech congruent with her affect; denied suicidal and homicidal thoughts; had a slightly unusual speech pattern; had extreme difficulties with serial 7s, in that she performed them very slowly, but she had accurate responses; had good recall; and had average estimated intelligence. (Tr. at 366-367.)

She requested assistance in trying to improve her social skills. (Tr. at 367.) He diagnosed Claimant with ADD without hyperactivity, Anxiety Disorder NOS, and Depressive Disorder NOS; he assigned a GAF score of 60.[9] (Id.) Mr. Terry planned to review Claimant's records from Laurel Ridge Psychological Associates to devise a better treatment plan based on her intellectual anticognitive functioning. (Id.)

During a follow-up appointment with Mr. Terry two weeks later, Claimant reported that her anxiety was excessive, but she had refused in the past to take medication – she had reservations about taking Adderall, but acknowledged that it helped her function better academically. (Tr. at 368.) Mr. Terry felt that Claimant's mother's overprotective nature could be the cause of some of Claimant's anxiety and had some influence on her social development. (Id.). When Claimant returned in September 2012, she and her mother both reported that Claimant was compliant with medication. (Tr. at 369.) In addition, both Claimant and her mother thought Claimant appeared calmer. (Id.)

During an October 2012 follow-up appointment with Dr. Parrish, Claimant was taking her medications as prescribed and tolerating them without any difficulty or side effects. (Tr. at 300.)

---

[9] A GAF of 51-60 indicates that the person has "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

Dr. Parrish's mental status examination and treatment remained the same. (Tr. at 301-302.) Claimant also followed up with Mr. Terry, reporting that she continued medication compliance and that she recognized the benefits of medication. (Tr. at 370.) She found herself calmer while on the university campus, was participating better in her classes, was interacting with students and professors more easily, and was less withdrawn. (Id.) Although she was still somewhat anxious about a driver's test, her anxiety was offset by the excitement of being more independent and driving herself. (Id.) She reported no panic attacks since her last visit. (Id.) Later that month, she followed up at Dr. Parrish's office and reported a worsening mood (Tr. at 297.); the nurse practitioner prescribed Prozac and anti-nausea medication. (Tr. at 299.)

Claimant saw Mr. Terry in November 2012 and stated she thought she was passing all her classes, but had not yet received her grades. (Tr. at 371.) She had not taken any further steps to obtain a driver's license because her mother had concerns about her driving due to "noticeable deficits". (Id.) Claimant's mother was concerned that Claimant would not be able to live independently or succeed outside of a structured and supervised environment; Mr. Terry noted, "[w]e were in total agreement on these issues." (Id.) At a follow-up appointment at the end of November 2012, Claimant reported significantly reduced anxiety symptoms, allowing her to increase her sociability on campus. (Tr. at 372.) When Claimant related interest in going out with a classmate and wondered if he was interested in her, upon her reflections, Mr. Terry felt Claimant's maturity level was below her chronological age. (Id.) Mr. Terry noted that Dr. Parrish was going to give Claimant trial medication or reduce her dose of Prozac to help with her nightmares.

During a December 2012 follow-up appointment, Dr. Parrish's mental status examination

12

showed Claimant was alert and oriented times three with no impairment of recent or remote memory, a normal attention span, and the ability to concentrate. (Tr. at 295.) He substituted Paxil for Prozac in an effort to reduce nightmares. (Tr. at 296.)

In January 2013, Claimant followed up with Mr. Terry after a family vacation to Florida. (Tr. at 373.) Claimant reported a significant reduction in nightmares since the medication substitution. (Id.) She had passed all of her classes, and was going to return to the university carrying 13 credit hours for the spring semester. (Id.) She also followed up with Dr. Parrish regarding her anxiety, and she felt well and reported no new problems. (Tr. at 290.) She was taking and tolerating her medications without any difficulty or side effects. (Id.) On examination, Claimant's mental status was normal. (Tr. at 291.) Dr. Parrish refilled her medications. (Tr. at 292.)

In February 2013, Claimant reported to Mr. Terry that she was still feeling more socially comfortable. (Tr. at 374.) Her father was concerned about Claimant's ability to get to school once he graduated, as she had not yet taken the driver's test. (Id.) During a March 2013 appointment, Claimant stated she had been flirting with a boy in her class, but that her parents discouraged her. (Tr. at 375.) Claimant also described one instance of social anxiety involving a crowd at a family birthday party that caused her to withdraw to a bedroom, but she "continue[d] to feel improved overall and was very appreciative of the ability to interact much more easily than she could before". (Id.) Claimant saw Mr. Terry again in April 2013, and reported some anxiety due to end-of-year academic pressures. (Tr. at 376.) Mr. Terry discussed strategies to minimize test anxiety and to get assignments organized. (Id.)

During a May 2013 follow-up with Dr. Parrish, Claimant had no complaints. (Tr. at 352.)

13

She continued to take and tolerate her medications well without any reported difficulties or side effects. (Id.) She was oriented times three with an appropriate mood and affect (Tr. at 354.); Dr. Parrish did not make any medication adjustments. (Tr. at 355.)

Claimant met with Mr. Terry in June 2013, proud to report achieving B's and C's during her last semester given the difficulty of her course load. (Tr. at 377.) She was also excited about an upcoming family vacation, and a concert she was planning on attending in July. (Id.) Although she reported some situational stressors involving friendships, she continued to believe her medications provided her with some symptom relief. (Id.) During an August 2013 appointment, she was in good spirits; she reported that she had a good month that included three concerts, including a "meet and greet" with her favorite band, and a trip to the beach. (Tr. at 378.) Mr. Terry noted Claimant seemed pleased with her summer and did not have any major trepidations about upcoming college classes. (Id.)

In September 2013, Mr. Terry completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" in which he opined that Claimant had mild limitations in her ability to remember locations and work-like procedures; understand and remember simple instructions; and make simple work-related decisions. (Tr. at 379.) He stated she had moderate limitations in carrying out short, simple instructions; understanding, remembering, and carrying out detailed instructions; performing activities within a schedule and maintaining regular attendance; completing a normal workday or workweek; and performing at a consistent pace. (Id.) Mr. Terry stated Claimant had marked limitations in maintaining attention and concentration for extended periods; sustaining an ordinary routine without special supervision; and working with or near others without being distracted by them. (Id.) As for interaction, Mr. Terry opined that

Claimant had moderate limitations in interacting appropriately with supervisors and co-workers, and responding appropriately to changes in a routine work setting; and marked limitations in interacting appropriately with the public and responding appropriately to work pressures in a usual work situation. (Tr. at 380.) In support of his opinion, Mr. Terry stated that Claimant functioned in a controlled, stress-free environment with parental support and supervision and that, without such support, she would not be able to function. (Id.) Mr. Terry estimated that Claimant would miss work approximately three times per month. (Tr. at 381.)

When she returned to see Mr. Terry in October 2013, Claimant complained of recent irritability, but stated that her anxiety was adequately managed. (Tr. at 453). Mr. Terry noted that her thinking was self-centered and immature, and this behavior was the focus of the therapy session. (Id.) She reported a milestone at school, stating she read the news in front of the camera, and she was pleased with how she did. (Id.) During a December 2013 follow-up, Claimant admitted that she was failing three of her one-hour courses because she had either not been going to classes, or was not doing the work for the online classes. (Tr. at 452.) Claimant's father was present during the appointment, and indicated that he could not afford to pay for her schooling if she was not going to work towards a measurable goal. (Id.)

She followed up with Mr. Terry in January 2014. (Tr. at 451.) She indicated she could still make up the work in her three-hour online course, and that failing the other two one-hour courses did not destroy her grade point average. (Id.) Dr. Parrish had Claimant discontinue Paxil due to weight gain and started Lexapro. (Tr. at 430, 451.) When she presented for a one-month medication checkup, Claimant was cooperative and well-groomed, oriented times three, and had an appropriate mood and affect. (Tr. at 433.)

15

In February 2014, Claimant told Mr. Terry that she felt that she was doing well in school, and that she was attending her classes and had been turning in all of her assignments. (Tr. at 450.) She complained of some irritability, but admitted she was skipping some of her doses of medication. (Id.) By March 2014, Claimant stated she did not feel Lexapro was as effective. (Tr. at 449.)

During an April 2014 medication check, Claimant was tolerating her medications well without any noted difficulties or side effects. (Tr. at 434.) Dr. Parrish described her anxiety as stable, with the exception of some anger at times. (Id.) Dr. Parrish increased her Lexapro dose and asked her to continue taking Ritalin. (Tr. at 436.)

When she saw Mr. Terry in May 2014, Claimant reported failing three of her college courses. (Tr. at 448.) Mr. Terry, Claimant, and her mother agreed that Claimant should stop attending Concord University and, instead, look at the local community college. (Id.) Claimant's mother reported that Claimant showed no initiative at home. (Id.)

During a June 2014 medication check, Claimant stated that her anger outbursts had improved, but she felt more tired on the increased Lexapro dose. (Tr. at 438.) Dr. Parrish diagnosed a vitamin B deficiency. (Tr. at 440.)

Claimant followed up with Dr. Parrish on October 1, 2014. (Tr. at 442-444.) Dr. Parrish noted that Claimant was alert and oriented times three, had no impairment in recent or remote memory, and had a normal attention span and ability to concentrate. (Tr. at 444.) Dr. Parrish recommended that Claimant start taking Vayarin, an omega-3 fatty acid. (Id.) That same day, Claimant and her mother saw Mr. Terry for the first time since May. (Tr. at 447.) Claimant was no longer enrolled at Concord University, and her mother stated that she stayed home doing

nothing other than watching television. (Id.) Although Claimant was content with this arrangement, her mother was not. (Id.) Mr. Terry recommended vocational training, including job coach and job placement activities. (Id.)

By October 30, 2014, Claimant's mother reported to Mr. Terry that Claimant was doing more at home in terms of cleaning and laundry. (Tr. at 446.) However, Mr. Terry noted Claimant was not working towards career opportunities or her future; he felt she lacked initiative, but did not feel it was simply a matter of being lazy. (Id.) Mr. Terry recommended that Claimant return after her Social Security disability hearing in December. (Id.)

Kelly Robinson, M.A.:

On April 8, 2013, SSA consultant Kelly Robinson conducted a psychological evaluation for which she had been provided the evaluation report by Mr. Rhodes, a January 25, 2013 history and physical by Christopher D. Parrish, D.O., and Claimant's Function Report - Adult. (Tr. at 343-349.) Claimant was casually dressed with fair grooming and personal hygiene, had good speech production with normal rate and volume and no speech problems were noted. (Tr. at 343.) She reported that she lived with her parents and her brother. (Id.) Her primary complaints were low self-esteem and feelings of sadness, although during the evaluation her current mood was "pretty good". (Id.) She further reported difficulty functioning in public that caused her to avoid social situations. (Tr. at 344.) Claimant also reported a history of ADD, but denied any hyperactivity; she also reported a medical history that included fragile X syndrome and problems with fine motor skills. (Id.) She took Ritalin as prescribed by her family doctor, stating that "it helps a lot, I wouldn't be writing all my school papers if it wasn't for that, I wouldn't have them finished at all". (Id.) She had difficulty balancing a checkbook and making change, stating,

"me and math don't get along". (Id.) Claimant was currently enrolled in 12 credit hours of courses at Concord University; she reported "I'm under this disability plan" with accommodations such as being placed in a separate room to avoid distractions. (Id.) She was working towards a Bachelor's degree in Broadcasting. (Tr. at 345.)

Claimant described her typical day involved caring for her personal hygiene; having breakfast; taking her brother to school; going with her father to college; attending classes; studying or working on a paper; watching television; eating dinner; playing on Facebook; reading novels and textbooks; texting with family and friends; and listening to music. (Tr. at 347.) Approximately once per week, she folded laundry, and shopped at the mall with her friend or her mother. (Id.) About once per month, Claimant attended therapy. (Id.) She said it was hard for her to talk to people before she started taking her medication. (Id.) During the mental status examination Ms. Robinson observed that Claimant was alert and oriented to person, place, time, and date; had a euthymic mood with a broad and reactive affect; had logical and coherent thought processes; had no unusual thought content such as delusions, obsessive thoughts or compulsive behaviors; reported no unusual perceptual experiences; had fair insight and normal judgment; denied suicidal and homicidal thoughts; had normal immediate, recent, and remote memory; but Claimant's "concentration was severely deficient based on her ability to do serial 3s". (Tr. at 346, 347.) With regard to social functioning, Ms. Robinson found Claimant to be mildly deficient based on her interaction with the examiner and staff; her persistence and pace were found within normal limits based on the mental status examination. (Tr. at 347-348.) The psychologist diagnosed Depressive Disorder NOS; Social Phobia; ADHD, predominantly inattentive type; Cognitive Disorder NOS-by record; Borderline Intellectual Functioning-by record of previous test results; and by self-report,

18

Fragile X Syndrome and problems with fine motor skills. (Tr. at 346.) Ms. Robinson opined Claimant was capable of managing any benefits she might receive. (Tr. at 348.)

State Agency Psychological Consultants:

At the initial level of Claimant's claim on June 10, 2013, State agency psychologist Debra Lilly, Ph.D., reviewed the evidence of record. (Tr. at 90-100.) Dr. Lilly noted that Claimant's goal was to attend college and become a reporter, a goal that the school did not see as unreasonable. (Tr. at 95.) Dr. Lilly further noted that Claimant was said to have fragile X syndrome, but that there was no medical evidence in the record of its presence. (Id.) Based on the evidence, Dr. Lilly concluded that Claimant had moderate limitations in the broad functional domain of maintaining attention and concentration, and mild limitations in the broad functional domains of performing daily activities and maintaining social functioning, but that she could learn, recall, and perform one to three step commands in situations that required limited interactions with the public and had no high production demands. (Tr. at 95, 98.) At the reconsideration level of review on August 23, 2013, State agency psychiatrist James Binder, M.D., came to the same conclusions. (Tr. at 102-113.) Both consultants found four severe impairments: Affective Disorders; Anxiety Disorders; Borderline Intellectual Functioning; and ADD/ADHD. (Tr. at 95, 107.) They both conducted their reviews using Listings 12.02 and 12.04. (Tr. at 95, 108.) As to their identical ratings on the B Criteria of the Mental Impairment Listings (restrictions of activities of daily living, difficulties in maintaining social functioning, episodes in maintaining concentration, persistence, or pace and repeated episodes of decompensation), the consultants provided the same explanation:

> The claimant's school information was reviewed. She had goal of attending college and becoming a reporter. School did not see that this was an unreasonable goal. She had good behavior and was in 100% regular education courses in her senior year. Previous testing was inconsistent. Her memory was said to be "well retained". She

is currently taking 12 hours of university courses.

The AFR is not consistent with the preponderance of the evidence. The claimant is in college. She is said to have Fragile X, but does not have medical evidence of such. Females with this mutation have considerable variability. As such, even with evidence of the presence of this, it has limited meaning in females as far as predicting difficulties. (Id.)

L. Andrew Steward, Ph.D.:

At Claimant's attorney's request, Dr. Steward performed a psychological evaluation on September 16, 2014. (Tr. at 383-391, 398-404.) Dr. Steward administered four psychological tests (Tr. at 384.) and reviewed the reports generated by John Terry, Kelly Robinson, and Robert D. Rhodes. (Tr. at 386-387.) Dr. Steward observed that Claimant was adequately dressed and groomed; was appropriately talkative; established a rapport; and gave adequate test effort. (Tr. at 385.) Her affect was somewhat eccentric, and she had an anxious mood but was oriented in all spheres; demonstrated no evidence of hallucinations, delusions, or paranoia; and had somewhat diminished thought content and organization, but she was not confused. (Id.) Claimant's ability to perform calculations and her memory were decreased, but she had normal attention and concentration. (Id.)

Claimant indicated she was a junior at Concord University, majoring in Broadcasting; she had never worked. (Id.) She was anxious at times, particularly when she forgot to take her medications, and could be tense around strangers and crowds. (Id.) She reported a history of depression dating back to high school, but she did not feel useless, worthless, helpless, or hopeless. (Id.) She described her self-esteem as "pretty good". (Id.) Her current medications included Lexapro and Ritalin, which she described as "very helpful". (Id.) She spent her time going to school, studying, hanging out in her room, and watching Netflix. (Tr. at 386.) She visited her

family a lot, and at times had visitors; she did not have a driver's license. (Id.) She lived with her parents and her brother, with whom she got along pretty well. (Id.)

Dr. Steward also interviewed Claimant's mother, who stated that Claimant had failed the last three semesters of college and had stopped going. (Id.) She said she and her husband did everything for her, including all of Claimant's college work, and that Claimant had no friends her age. (Id.) Claimant's mother also said that Claimant was socially awkward and rarely left her room (Id.)

Dr. Steward administered the Wechsler Adult Intelligence Scale-IV (WAIS-IV), which yielded test results consistent with borderline intellectual functioning (BIF). (Tr. at 387-388, 390.) Dr. Steward diagnosed Unspecified Depressive Disorder, Unspecified Anxiety Disorder, including social anxiety, Autism Spectrum Disorder, Limited Intellectual Functioning, Fragile X Syndrome, (limited skills in doing activities of daily living and independent living), and a history of ADHD. (Tr. at 391.) He summarized his findings as follows:

> Rachael is functioning overall at a limited intellectual functioning level. Most importantly, she has deficits in all areas of independent living, which coincides with a diagnosis of Fragile X. The Fragile X has contributed to autism spectrum disorder and ADHD. She also presents with depression and anxiety, including social anxiety. These disorders were confirmed by behavioral reports; mental status observations; collateral reports, medical records, and PAI and GARS-2 test results. She does appear permanently and totally disabled from any type of gainful employment currently and readily available in the United States economic market on a sustained basis for at least a year or more. Prognosis appears very poor for large gains in behavior, and she should remain in psychotherapeutic intervention. She does appear capable of managing her own funds.

(Id.)

In a medical source statement, Dr. Steward opined that Claimant had between moderate and extreme limitations in work-related activities, where "extreme" was defined as "no useful ability to function in this area". (Tr. at 393-394, 406-408.) He also indicated that Claimant would

21

be absent from work more than three times per month. (Tr. at 395.)

The Administrative Hearing

Claimant Testimony:

Claimant testified that she was a junior when she stopped attending Concord University that September. (Tr. at 45.) She testified that she majored in broadcast journalism and wanted to get her degree. (Tr. at 45, 49.) Claimant explained that she dropped out of school due to poor grades and that she could not handle the pressure of it all. (Tr. at 46-47.) She testified that her grades at Concord were "pretty good" when her father attended school with her, but he helped her with her class work; after he left school, she did not pass her classes, she was not going to one of her classes. (Tr. at 50-51.)

She testified that she could care for her own personal needs, such as bathing every day and comb her hair when she goes out. (Tr. at 47, 52.) She had a laptop that she had used for her schoolwork as well as for Facebook. (Tr. at 47-48.) She only socialized with family members. (Tr. at 48.) She gets along with her mother very well. (Tr. at 52.) She sometimes would do some chores at home when told to do so. (Tr. at 48, 52-53.) She watched television a lot during the day. (Tr. at 51.) She spends most of her time in her room and does not get out at all. (Tr. at 49.) Claimant admitted that she had gained a lot of weight and weighed 290 pounds. (Id.) She feels depressed a lot. (Tr. at 52.)

In response to questioning by the ALJ as to why she cannot work, Claimant testified, "I don't know how to answer that. I just panic really easily around strangers and other people. I don't know." (Tr. at 48-49.) Although she wants to get out and live on her own, she does not feel like she can; the thought scares her. (Tr. at 53.) She believed Mr. Terry has helped her. (Id.)

Tina Renee Dodson Testimony:

Mrs. Dodson is Claimant's mother. (Tr. at 54.) She stated that Claimant had "always" been in special education classes while in elementary school, junior high school, and high school. (Id.) Mrs. Dodson testified that her daughter had friends in school up to middle school, then she became more depressed and withdrawn from others. (Tr. at 55.) She stated both Claimant and her son have fragile X syndrome; her son has significant mental impairments and Claimant functions a little bit better. (Tr. at 56.)

She wanted what was best for Claimant, and pushed her into school, although Claimant did not do her school work on her own. (Tr. at 57.) Mrs. Dodson said that her husband had to beg Concord to allow Claimant to stay on academic probation due to her low ACT scores. (Tr. at 58.) After her husband graduated from Concord, Claimant was not going to most of her classes. (Id.) Mrs. Dodson testified that she picked Claimant's major, filled out the financial aid forms, chose her classes, and would even have to get her up in the mornings, fix her hair and makeup for her, and lay out her clothes. (Id.)

Mrs. Dodson testified that she has to force Claimant to do chores or to even interact with family members or to do something Claimant likes. (Tr. at 59.) Mrs. Dodson said that Claimant likes the idea of getting her driver's license, but she is unable to process information fast enough to drive; Claimant will not be able to drive. (Id.)

In response to the ALJ's questions, Mrs. Dodson did not think Claimant could do a simple job because she forgets and she must be told step by step no matter how many times Claimant has done the task before. (Tr. at 60-61.) Because of her ADD part of fragile X, Mrs. Dodson will not permit Claimant to cook at home because she forgets about the stove or over being left on. (Tr. at

61.)

John C. Terry, M.S. Testimony:

Mr. Terry testified that he had treated Claimant for a little over two years and had probably seen her approximately twenty to twenty-five times. (Tr. at 39.)  She was originally referred to the him by her family physician for the treatment of anxiety. (Id.) In the course of his treatment, Mr. Terry obtained the neuropsychological evaluation results of Mr. Rhodes; Mr. Terry explained that the "evaluation I think very clearly points out her cognitive impairments, and those I have seen in practical terms in her recent attempts and failure to attend college". (Id.) Mr. Terry testified that Mr. Rhodes's assessment and prognosis, what "they feared would happen actually happened." (Id.)

According to Mr. Terry, the etiology of Claimant's limitations, "to a very, very large degree", was fragile X syndrome. (Id.) He stated:

> Initially I thought that perhaps Ms. Dodson was simply somewhat lazy and maybe a bit spoiled, but I have over the course of treatment observed that it's not near that simple. Your Honor, I never come and testify in these type situations, but I feel like in this case it was a little bit unusual and complicated, and I felt like it was the right thing to do, so I'm here to try and explain that I don't feel that this young lady is likely to improve to any significant degree. I don't see that she is going to function at a much higher level socially. I question whether she will ever be able to even live independently.

(Tr. at 39-40.)

In addressing the "college experiment", he explained:

> Yes, it was an effort to try to give her a chance to see what she may be able to do, and in essence, she has been limited. She's topped out, so to speak, with these cognitive impairments that are outlined in that [Rhodes] evaluation I referred to earlier, and the emotional issues that she suffers from as well.

(Tr. at 40.)

During the course of his treatment, he testified that Claimant obviously does minimize her

problems "in that she's not able to express herself very well." (Tr. at 41.) He explained that much of her anxiety was expressed in behavioral terms, the primary example being that she will become very impulsive and act out, or become extremely repressed and withdrawn. (Id.)

Mr. Terry testified that he believed Claimant met Listings 12.02 and 12.04 as of the first date he had contact with her, August 15, 2012. (Tr. at 41-42.) In response to the ALJ's questioning if Claimant met B criteria, Mr. Terry explained:

> Yes, certainly. She certainly meets all those criteria. She has a very restrictive lifestyle. She has no friends. The only friends she's ever had was a next door neighbor, and the friend when she began to reach normal social maturization levels the disparity between the two was so evident, in essence, Rachael got left behind and she's never been able to catch up, so she's never been able to make any other friends. She has very limited ability to sustain her attention, to sustain any endurance in any type of activity. She's rather lethargic, has a sedentary lifestyle, which is a significant problem that we have tried unsuccessfully to address as well. When she has these episodes of extreme anxiety, which she often has grossly disproportionate responses to stressors in her life, but when they happen then she can become very regressed and it takes her days to a week or more to come out of these episodes.

(Tr. at 42-43.)

When asked whether Claimant would have been able to attend college without constant parental supervision, he opined:

> I don't think so. She doesn't drive. Her father would take her to the campus, would gather her and take her back home. He was taking classes himself at the time. One of the goals that we unsuccessfully set in treatment was for her to get a driver's license. I don't see that ever happening. She is totally overwhelmed at the prospect of ever driving, and [frankly], I don't know that we'd ever want her to drive.

(Tr. at 43.)

When asked why Claimant would be unable to perform a job involving simple tasks, given that she attended/completed some college courses, Mr. Terry stated that Claimant would not be able to sustain her attention and focus long enough. (Tr. at 43-44.) He further stated that Claimant

tended to decompensate with any responsibilities. (Tr. at 44.) When the ALJ inquired as to how this decompensation was manifested, the psychologist explained that "(p)rimarily its either behavioral acting out or emotional regression. (<u>Id</u>.) Finally, the ALJ inquired whether Claimant's not taking her medication would affect her ability to perform, and Mr. Terry explained, that he did not think her taking medication or not likely has a significant impact on her ability to function at a higher level. (<u>Id</u>.)

<u>Vocational Expert (VE) Barry C. Hensley Testimony:</u>

The ALJ asked the VE to assume a younger individual with a high school education, no past relevant work experience, who could understand, remember, and carry out simple instructions, and repetitive, unskilled work that involves no interactions with the general public, and no more than occasional interaction with coworkers and supervisors, but is able to respond appropriately to supervision, coworkers, and usual work situations, not in a fast-paced environment such as an assembly line. (Tr. at 63.) The VE testified that such an individual could perform light unskilled work such as a maid, a laundry worker, and hand packer. (Tr. at 63-64.) The VE said that if the individual was off task 11 to 20 percent on a routine and regular basis, there would be no work available. (Tr. at 65.) In response to questioning by Claimant's representative, the VE testified that the jobs he identified require the individual to be responsible for going to work every day, and that if the individual was absent more than three times per month, that degree of absenteeism would eliminate the job base. (<u>Id</u>.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

One area that Claimant disputes with the ALJ's decision is that she did not abide by the

Regulations or this district's jurisprudence[10] when she failed to give Claimant's treating psychologist's opinion greater weight. (Document No. 17 at 11-17.) Not only did Claimant's treating psychologist opine that she met listings criteria, he provided testimony at the administrative hearing, allowing the adjudicator the opportunity to ask him specific questions to elicit answers supporting his opinions, however, Claimant contends that the ALJ discredited his opinions with boilerplate language in her written decision, without providing citations in the record she believed undermined his position.[11] (Id.) In addition to improperly evaluating a treating provider, Claimant argues that the ALJ did not give appropriate credit to the other examining psychological consultants' opinions, specifically by discounting the more serious deficits they noted Claimant had, and instead fashioned her RFC assessment from her own devises[12]. (Id. at 6-7, 9-11.)

Claimant also disputes the ALJ's credibility determination because Claimant's credibility was never an issue, but she discredited her mother's credibility regarding Claimant's mental impairments, although Claimant's mother's allegations were consistent, and eventually, shared by Claimant's treating psychologist, which confirmed Claimant's mental deficits. (Id. at 18-20.)

Finally, Claimant contends that the ALJ's RFC assessment was based upon the mistaken opinions provided by the State agency non-examining psychological consultants, wholly fails to fairly consider Claimant's deficits that were prevalent in the record and by her treating psychologist's testimony, and is devoid of reasoning supporting the ALJ's conclusions.[13] (Id. at

---

[10] Thompson v. Colvin, 2013 WL 4742776 (S.D.W. Va. 2013).
[11] O'Dell v. Astrue, 2010 WL 5563572 (S.D.W. Va. 2010); Mauzy v. Astrue, 2010 WL 1369107 (N.D.W. Va. 2010); Meadows v. Colvin, 2014 WL 4656123 (S.D.W. Va. 2014).
[12] Kern v. Astrue, 2011 WL 5520230 (W.D. Va. 2011); Foquer v. Colvin, 2016 WL 4250364 (N.D.W. Va. 2016).
[13] Cook v. Hechler, 783 F.2d 1168, 1172 (4th Cir. 1986).

21-23.)

In response, the Commissioner argues that the ALJ appropriately evaluated the opinion evidence as required under the Regulations and Social Security Rulings; the ALJ adequately discussed Mr. Rhodes's testing results and was not required to repeat his findings word for word. (Document No. 20 at 16-17.) With regard to Ms. Robinson's finding Claimant had severe restrictions in concentration, the evidence of record showed that was not always the case, and appropriately found, her concentration was moderately limited. (Id. at 17.) In reference to Claimant's argument that the ALJ's treatment of State agency consultants' opinion was "bizarre", the Commissioner states that it is not uncommon for the earlier reviews of the evidence to find more mild restrictions and the ALJ finding more moderate limitations due to the additional evidence submitted afterwards, which was the case here; the ALJ's evaluation of the State agency consultants' opinions was likewise proper and supported by the evidence of record. (Id. at 17-18.) Regarding Dr. Steward's opinion, the ALJ's treatment of same is supported by the evidence and appropriate under the Regulations, due to the inconsistencies within his own report and with the record on the whole. (Id. at 18-19.) Finally, the Commissioner argues that the ALJ also properly discounted Mr. Terry's endorsement of Claimant's disabling impairments because it was inconsistent with his own treatment records as well as with her treating pediatrician's records, both of which indicated Claimant's symptoms were stable while she was on medication. (Id. at 19.)

The Commissioner next contends that the ALJ's credibility analysis of both Claimant's and her mother's allegations was proper; because Claimant's mother prepared the disability application forms, her third party statements were appropriately considered against the objective evidence of record pursuant to SSR 06-3p. (Id. at 20-21.) Finally, the Commissioner argues that

the ALJ's RFC assessment was the proper result of the reconciliation of the objective evidence of record, Claimant's alleged limitations, and medical expert opinion of same. (Id. at 21-23.)

In reply, Claimant restates her argument that the ALJ's decision is not supported by substantial evidence; in particular, the opinion evidence was not evaluated pursuant to the Regulations or controlling case law, and the Commissioner provides *post hoc* explanation for the ALJ's conclusions that were not in the record before her, particularly with respect to Claimant's concentration deficits. (Document No. 1-3.) Claimant maintains that the opinion of her treating psychologist, Mr. Terry, that her impairments meet or equal the listings is unrebutted, in spite of the ALJ's credibility analyses and RFC assessment. (Id. at 3-5.)

Analysis

Evaluation of Opinion Evidence:

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 416.927(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 416.927(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. § 416.927(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a

whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.[14] Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 416.927(c)(2).

In this case, the ALJ afforded the medical source statement, described *supra*, from Claimant's treating psychologist, John Terry, M.S., "little weight". (Tr. at 25.) The ALJ explained that Mr. Terry's treatment notes "do not reflect this degree of limitation", and noted that his records prior to his September 2013 medical source statement indicated that Claimant was doing well, "describing a recent family trip, as well as a meet and greet with her favorite musical group at a concert."[15] (Tr. at 25-26.) The ALJ also found Mr. Terry's testimony that Claimant met Listing criteria was not supported by the record, and again explained that his treatment notes, as well as the records from Blue Ridge[16], were inconsistent with such extreme limitations. (Tr. at 26.)

---

[14] It is noted that the ALJ referenced these Regulations in the written decision. (Tr. at 25.)

[15] The ALJ noted these came from an August 5, 2013 follow up appointment. (Tr. at 22.)

[16] Claimant has averred in her Motion that this was a typographical error, and that the ALJ was referring to Laurel Ridge Psychological Associates/Robert Rhodes. (Document No. 17 at 15, fn.3.) However, after review of the record, the undersigned finds that the ALJ was referring to Blue Ridge Internal Medicine, which she referenced numerous times throughout her decision. (Tr. at 19.) The undersigned notes that Blue Ridge is the name of the facilities where Claimant's primary care physician, Dr. Parrish, treated Claimant. The undersigned further notes that the Laurel Ridge Psychological Associates record was identified in the Court Transcript Index as Exhibit 2F, and was not referenced by the ALJ by name, only as "Exhibit 2F". (Tr. at 17, 19.)

Indeed, the ALJ referenced several comparisons of the treatment records between Mr. Terry and Dr. Parrish, beginning with Claimant's July 17, 2012 follow appointment with Dr. Parrish for ADD, vitamin B deficiency, and fatigue, and his August 15, 2012 referral to Mr. Terry to address Claimant's mental health issues. (Tr. at 19.) The ALJ continued with a lengthy discussion of the records provided by Dr. Parrish ("Blue Ridge") and by Mr. Terry that spanned over two years of treatment. (Tr. at 19-24.) The ALJ's review of these records primarily concerned Claimant's mental health issues that her primary care physician treated with medication, and that her psychologist treated with counseling sessions, simultaneously.

The undersigned notes that the Fourth Circuit has held that when a condition can be controlled with medication or treatment, it is not considered a disabling condition under the Act. <u>Gross v. Heckler</u>, 785 F.2d 1163, 1166 (4th Cir. 1986). However, Mr. Terry testified specifically on this issue, and in response to the ALJ's query as to Claimant's not taking some of her medication and the effect on her ability to perform, the psychologist stated, "I don't feel that that's likely to have any significant impact on her ability to function at a higher level." (Tr. at 44.) There is no other opinion in the record to rebut that evidence; this is the most notable aspect about this case – Claimant's <u>treating psychologist testified</u> on her behalf.[17] More importantly, Mr. Terry provided the most reasonable assessment of Claimant's abilities and deficits in the record: his treatment notes including his testimony tracked his initial opinions that Claimant's problems stemmed either from her mother's coddling, or that Claimant was "simply somewhat lazy and maybe a bit spoiled", but eventually, Mr. Terry found that was not the case here. (Tr. at 40.) What is also noteworthy is

---

[17] Mr. Terry testified that he "never" testifies in these cases, but he "felt like in this case it was a little bit unusual and complicated, and I felt like it was the right thing to do, so I'm here to try to explain that I don't feel that this young lady is likely to improve to any significant degree." (Tr. at 40.)

that Mr. Terry obtained Mr. Rhodes's neuropsychological evaluation, and Claimant's treatment records from Laurel Ridge Psychological Associates, where Claimant had received mental health treatment by psychologist, Mr. Brezinski, for several years. Mr. Terry is the only specialist who had any "detailed, longitudinal picture" concerning Claimant's cognitive impairments and overall functioning, and the only specialist of record who attempted to improve Claimant's mental health, by encouraging the "college experiment" initiated by her parents, by recommending that she try to obtain her driver's license, or with vocational rehabilitation. See 20 C.F.R. § 416.927(c)(2) (Id.) In sum, Mr. Terry's experience with this Claimant provides the most accurate assessment of her functionality, and ultimately determined, after more than two years of treatment, that she was incapable of reaching the goals he and her parents considered. If anything, Mr. Terry's treatment records and testimony confirm that Claimant deteriorated as soon as she was given a modicum of independence, and without the virtual hand-holding provided by her parents, and exhibited her inability to live and function as a typical twenty-three-year-old female college student.

In reference to the opinion evidence concerning Claimant's functioning in the four areas described collectively as "B criteria", it is further noted that Mr. Terry testified that Claimant met the Listings in 12.02 and 12.04, because he believed that she satisfied the "B criteria". (Tr. at 18, 41.) Regarding the other opinion evidence, the ALJ found Ms. Robinson's opinion and objective findings are supportive of a moderate limitation in concentration, persistence, and pace". (Tr. at 26.) The ALJ afforded Dr. Steward's opinion "little weight" as to the ultimate issue of disability, but also because his limitations "have little support in the record or the examination itself", as well as due to the ALJ's finding that Dr. Steward's noted limitations were based on the reports of Claimant's mother, who she found "not fully credible." (Id.) The ALJ noted that both Mr. Terry

and Dr. Steward opined that Claimant would be absent from work three or more times per month. (Tr. at 22, 24.) As mentioned *supra*, the VE testified that such absenteeism would preclude all jobs.

Nevertheless, the ALJ explicitly found that Claimant did not meet the Listings under 12.02, 12.04 or 12.06, and in referencing the four areas of functioning, she first found Claimant had mild restrictions in activities of daily living, on account of her ability to care for her personal needs, prepare simple meals, and perform light housework.[18] (Tr. at 16.) In addition, the ALJ noted that she completes chores, "though with some urging from parents", and attended college until September 2014.[19] (Id.) With regard to Claimant's social functioning, the ALJ found that she had moderate difficulties, noting that Claimant complained of issues with crowds and strangers, but admitted improvement with these issues when compliant with her medication. (Id.) Noting her mother's concern with Claimant's age appropriate behavior, the ALJ gave Claimant "the benefit of the doubt" despite the evidence that she attended college with few incidents, uses Facebook and Twitter independently, and gets along with her family members.[20] (Id.) Regarding concentration, persistence or pace, the ALJ found Claimant had moderate difficulties due to her borderline intellectual functioning, and her report of symptoms, though they can be controlled with medication.[21] (Tr. at 16-17.) Finally, the ALJ found no evidence for any episodes of decompensation. (Tr. at 17.)

---

[18] The ALJ references Exhibit 3E in support of these findings, Claimant's Function Report.
[19] Exhibits 6F, 9F and 11F were cited in support of these findings, which included Mr. Terry's treatment notes and Dr. Steward's psychological evaluation.
[20] The ALJ cited Exhibits 3E, 6F, 9F, 11F and "Hearing Testimony" in support of these findings.
[21] The ALJ cited Exhibits 3E, 1F, 2F, 6F, 9F, 11F and "Hearing Testimony" in support of these findings. In addition to the other records described supra, the ALJ referenced Claimant's IEP records from school (Exhibit 1F) and the neuropsychological evaluation by Mr. Rhodes (Exhibit 2F).

"In reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the Secretary." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). See also Smith v. Chater, 99 F.3d 635, 637 (4th Cir. 1996) ("The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court.") An ALJ has a duty to consider the evidence and explain her findings. See King v. Califano, 615 F.2d 1018, 1020 (4th Cir. 1980).

In this case, Mr. Terry, Claimant's treating psychologist, provided unrebutted opinion evidence that would normally be afforded significant, if not controlling weight, under the Regulations. 20 C.F.R. § 416.927(c)(2). The undersigned notes that the ALJ expressly found inconsistencies between Mr. Terry's medical source statement and his treatment notes in the months preceding same, which occurred over the months of July 2013 through September 2013. However, from the undersigned's review of Mr. Terry's treatment notes and his testimony after that time period, the evidence showed that Claimant's mental health declined. In fact, despite the records indicating Claimant's compliance with medication, her symptoms were anything but "can be controlled" as found by the ALJ. (Tr. at 17.) Claimant became far more reclusive, and far less engaged, causing Mr. Terry to abandon his treatment goals for her, which even the ALJ noted: On October 1, 2014, he recommended vocational rehabilitation, however, by October 30, 2014, Mr. Terry opined that Claimant's "ability to function or have effectiveness in terms of executive functioning was not available to her." (Tr. at 24.)

Claimant's treating psychologist provided testimonial evidence supported by clinical diagnoses that had been determined since 2009, when Mr. Rhodes evaluated Claimant under the supervision of psychologist William Brezinksi, who had treated this Claimant for several years

34

previously. Further, Claimant's symptoms stemming from her collective diagnoses, Fragile X syndrome, anxiety disorder, depressive disorder, attention deficit/hyperactivity disorder, and borderline intellectual functioning, have worsened over the years of treatment, despite best efforts, and none of this evidence has been demonstrated as inconsistent with other substantial evidence. Accordingly, the undersigned finds that the ALJ's evaluation of Mr. Terry's opinion evidence was not based upon substantial evidence and was improper under the Regulations, as there are no "good reasons" for the "little weight" afforded to Mr. Terry's opinion evidence.

Credibility Determination:

Social Security Ruling 96-7p[22] clarifies when the evaluation of symptoms, including pain, 20 C.F.R. § 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements.

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities,

---

[22] The undersigned is mindful that this Ruling has been superseded by SSR 16-3p, however, the previous Ruling was in effect at the time of the ALJ's decision, January 28, 2015.

and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

The ALJ explained the two-step process[23] required to assess Claimant's symptoms with the medical evidence, and expressly found Claimant's statements regarding the intensity, persistence and functional limitations of her symptoms not entirely credible. (Tr. at 24.) The ALJ stated that "multiple opinions provided by treating and examining sources, as well as by the claimant's mother" concluded that Claimant cannot work, and then noted the "absence of probative medical opinions supporting" her limitations. (Tr. at 25.)

The undersigned agrees with Claimant that her credibility was not at issue in this case, but Mrs. Dodson's credibility was. (Tr. at 26.) Claimant has argued that her claim was premised upon her mental impairments, not physical impairments. The undersigned recognizes that although an ALJ's credibility determinations are "virtually unreviewable" by a court[24], it appears that the ALJ's finding inconsistencies between Mrs. Dodson's statements regarding her daughter's fine motor skills issues and the medical record is a red herring. The undersigned agrees that the medical evidence of record did not indicate Claimant's fine motor skills were impaired; however, the allegations concerning Claimant's mental impairments, as noted in the medical records and during the administrative hearing, have been consistent since her claim was filed. More importantly, Mrs. Dodson and Claimant's allegations are supported by her treating psychologist, John Terry, M.S. The undersigned finds that in this case, the ALJ's credibility determination is irrelevant to the ultimate issue in this matter: Claimant's and Mrs. Dodson's allegations concerning Claimant's

---

[23] Pursuant to Craig v. Chater, 76 F.3d 585 (4th Cir. 1996).
[24] Ryan v. Astrue, 2011 WL 541125, at *3 (N.D.W. Va. Feb. 8, 2011) (citing Darvishian v. Geren, 2010 WL 5129870, *9 (4th Cir. Dec. 14, 2010).

mental impairments and their deleterious effect on her functioning never wavered during this proceeding, and the pertinent medical record of evidence and testimonies are consistent reflections of same.

RFC Assessment:

The RFC finding is the reflection of a claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. § 416.945(a). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The ALJ recognized that Claimant's ability to perform work at all exertional levels has been compromised by her nonexertional limitations. (Tr. at 27.) Given the ALJ's hypothetical, described *supra* under the VE's testimony, the VE opined that an individual with Claimant's profile could perform work as a maid and a laundry worker. (Id.) Claimant contends that the RFC assessment is based solely on "mistaken" opinions provided by two non-examining State agency consultants, who opined that Claimant was capable of performing one to three step commands, can respond appropriately to supervision, co-workers and usual work situations, but unsuited for fast-paced production work, despite Claimant's, Mrs. Dodson's, and even Mr. Terry's testimonies that Claimant is not capable of any kind of work as a result of her mental limitations. (Document 17 at 21-22.) The undersigned does not find that the source behind the ALJ's RFC assessment was

37

so limited: the ALJ noted Mr. Terry's conclusions in his medical source statement, Dr. Steward's mental status evaluation, as well as Ms. Robinson's conclusions from her evaluation. (Tr. at 22, 24, 25, 26.) However, the RFC does not "fairly" set out all of Claimant's impairments, insofar as the opinion evidence and testimony provided by treating psychologist John Terry, M.S. were improperly evaluated, accordingly, the undersigned finds that the RFC assessment was not based upon substantial evidence. See, e.g., Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is not supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 17.) is **GRANTED**, the Defendant's Motion for Judgment on the Pleadings (Document No. 20.) is **DENIED**, the final decision of the Commissioner is **REVERSED** and this matter is **REMANDED** back to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further administrative proceedings in order to properly evaluate the treating psychologist's opinion under the Regulations. This matter is hereby **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to provide copies of this Order to all counsel of record.

ENTER: January 11, 2017.

Omar J. Aboulhosn
United States Magistrate Judge

38